## In re HEALTH SCIENCE PRODUCTS, INC., Debtor.

### Bankruptcy No. 94–03938–BGC–11.

United States Bankruptcy Court,
N.D. Alabama,
Southern Division.

Aug. 21, 1995.

---

Robert Rubin and Tim Lupinacci, Birmingham, Alabama, for plaintiff-debtor.

Charles Cleveland, Birmingham, Alabama, for defendants.

## ORDER GRANTING MOTION TO ASSUME EXECUTORY CONTRACT

BENJAMIN COHEN, Bankruptcy Judge.

This matter is before the Court on the Debtor's Motion to Assume Executory Contract and on an Objection to Debtor's Motion to Assume Executory Contract filed by Jim and Anne Taylor. After notice a hearing was held on July 6, 1995. Robert Rubin and Tim Lupinacci, attorneys for the Debtor; Charles Cleveland, attorney for the Taylors; Jim and Anne Taylor; and representatives of the Debtor, appeared. Both matters were submitted on the testimony offered, the exhibits introduced into evidence, the record in the case, arguments of counsel and post-trial briefs. For the reasons expressed below, the Court finds that the Motion to Assume Executory Contract is due to be granted.

### I. Findings of Fact

In an earlier stage of this case, this Court found facts which now affect the instant matter. On April 13, 1995, the Court wrote:

Health Science Products, Inc., ("HSP") operates a plant for the manufacture of dental equipment in a building located on the real property which is the subject of the present controversy. In 1985, before the building was erected, Mr. Taylor owned the property in fee simple. With the desire to improve the property, Mr. Taylor transferred it to the Birmingham Industrial Development Board ("BIDB") in return for financing for the construction of the building. As evidence of this transaction a deed from Mr. Taylor to the BIDB was executed on August 14, 1985, and was recorded in the probate office of Jefferson County, Alabama, on that day.

To supply the necessary financing for the construction, the BIDB, pursuant to Ala.Code 1975, § 11–54–81 to § 11–54–101, issued and sold $900,000.00 in industrial development bonds. The indenture trustee on the bond issue was AmSouth Bank. With that financing the building was constructed and the BIDB leased the now improved property back to Mr. Taylor. The lease began on August 1, 1985, and is to end on December 10, 1998. The monthly rental reserved to the BIDB, which simply goes to retire the outstanding bonds, increases monthly. For example, the payment for the month in which this opinion was executed is $5,343, while the payment scheduled for the last month of the lease term is $7,437. At the end of the lease term, or when the bond indebtedness is paid in full, whichever occurs first, Mr. Taylor has the option to purchase the fee simple interest in the property for $1.00. The deed from Mr. Taylor to the BIDB, the trust indenture between AmSouth and the BIDB, and the lease between Mr. Taylor and the BIDB were all filed for record in the probate office of Jefferson County, Alabama, on August 14, 1985.

The desire of Mr. Taylor in this matter was not to occupy the property, but to sublet the property, or to sell his interest in the now improved and more valuable property, for a profit. Toward that end, Mr. Taylor advertised the property for "sale or lease."

*Health Science Products, Inc. v. Taylor*, 183 B.R. 903, 909 (Bankr.N.D.Ala.1995) (footnotes omitted).[1] HSP and the Taylors eventually entered into the contract that is the subject of the instant motion.

In the prior stage of this case, this Court described what it considered as the relationship between HSP and the Taylors. In characterizing that relationship, this Court wrote:

---

1. No appeal was taken. The Court adopts the entire opinion written there as support for the findings and conclusions expressed in this order, and finds that the facts in the opinion, and the conclusions reached, are still accurate and are appropriate for consideration here.

· The Relationship Between
HSP and Mr. Taylor

The obligation of Mr. Taylor under the contract is to deliver good title to the property to HSP on December 10, 1998. The obligation of HSP is to make the payments described in the promissory note which it executed in favor of Mr. Taylor. The contract encompasses both executory and nonexecutory elements.

Until December 10, 1998, the contract is executory, and Mr. Taylor's obligation to transfer legal title on that date is dependent on HSP's obligation to make the payments due under the contract before that date. In fact, the contract contemplates that Mr. Taylor will pay the remaining bond indebtedness with funds paid by HSP under the promissory note and sales contract. Mr. Taylor cannot pass title to the property until he actually acquires title to the property, by exercising the option to purchase provided for in the BIDB lease after satisfaction of the bond indebtedness. Indeed, any transfer of his interest in the property prior to satisfaction of the bond indebtedness, without the consent of all bondholders, would constitute a breach of the lease agreement between BIDB and Mr. Taylor. Also, until the bond indebtedness is satisfied, Mr. Taylor remains obligated under the lease agreement, regardless of his arrangement with HSP, while HSP has no obligation to make payments under the lease agreement to BIDB.

The contract contemplates that Mr. Taylor will not satisfy the bond indebtedness and exercise the purchase option until December 10, 1998, *unless HSP elects to prepay the purchase price owed to Mr. Taylor before that date.* The benefits anticipated from the contract by Mr. Taylor were that he would eventually receive a profit from his investment and that in the meantime he would be relieved of the burden of making the monthly payments called for under his lease agreement with BIDB. The benefits anticipated from the contract by HSP were that it could pay for the property over time and that, until Decem-

ber 10, 1998, it would have no obligation to pay real estate taxes on the property. For those benefits to be realized, both parties have substantial and material obligations which remain to be performed. Mr. Taylor must deliver good title to HSP on December 10, 1998, and, in the meantime, make the monthly lease payments to BIDB. HSP must make the monthly payments due under its contract with Mr. Taylor so that Mr. Taylor can make the monthly lease payments to BIDB.

The contract contemplates that on December 10, 1998, Mr. Taylor will deliver a fee simple deed to HSP and that the portion of the purchase price then remaining unpaid will be secured by a purchase money mortgage on the property. HSP's obligation to make the payments due under the mortgage beyond that date is dependent on the transfer of legal title of the property from Mr. Taylor. As of that date, but not before, HSP will have the right to require specific performance of the contract on the part of Mr. Taylor. As of December 10, 1998, the contract will, therefore, be executory no longer, and will evolve into an ordinary mortgage relationship. Until that date, however, the contract is executory and must be treated in all respects as an executory contract under 11 U.S.C. § 365.

*Id.* at 935–936 (footnotes omitted) (emphasis added).

Following the above opinion the parties asked the Court to clarify its holding regarding HSP's option to prepay the purchase price to the Taylors. To this end the Court amended a sentence of page 45 of the manuscript edition that referred to footnote 44. The amended version reads: "As of that date, *or any earlier date that HSP exercises its rights to refinance the remaining balance due as provided in the Contract,* the Debtor will have the right to require specific performance of the contract on the part of Mr. Taylor." *Health Science Products, Inc. v. Taylor,* 183 B.R. 903, 935–36 (Bankr.N.D.Ala. 1995) (full text unreported) (emphasis added).[2]

---

2. Although the parties and their attorneys agreed to, and even presented the Court with, the amended language quoted above, the Taylors do not agree that HSP has the right to, or option to,

Nothing presented to the Court subsequent to the findings, holding and amended opinion reproduced above changes this Court's opinion. Even after considering the additional evidence before it, this Court finds that the above-described remains true. The current relationship between HSP and the Taylors is the relationship that existed when the above was written.[3]

The current matter before this Court, however, makes additional findings of fact necessary. From the evidence presented on July 6, 1995, the Court finds the following, none of which is in conflict with this Court's earlier ruling.

Health Science Products, Inc. ("HSP") was formed in August 1969 to produce dental equipment and related products. The current president, Mr. Jim Wells, was hired by the company in 1988 after which he purchased the majority of the company's stock. Mr. Wells's experience was well suited for his work at HSP. He had been associated with the dental business since 1968. He began as a dental technician in the U.S. Navy. He attended several dental schools in the Navy, was a medical assistant during the Vietnam War and has worked both in the retail and manufacturing aspects of the industry.

HSP manufactures and sells a wide range of custom dental equipment, from single pieces of equipment to the planning and design of complete rooms and buildings. HSP is one of two manufacturers in the United States offering this custom service. Products include dental chairs and related equipment and all types of associated cabinetry.

HSP operates its manufacturing facility on the property and in the building subject to the pending motion through a "lease-purchase agreement." It is this "lease-purchase agreement" the Debtor now seeks to assume.

HSP filed its bankruptcy on July 5, 1994 due to a cash flow problem associated with its failure to remit withheld federal income taxes.[4]

The Debtor has experienced normal and not so normal problems since its bankruptcy filing. Like all debtors, HSP must compete as a chapter 11 debtor in the business world. It must satisfy its customers that it is in business to stay and that it has the financial ability to deliver its goods and services. These normal problems have, however, been compounded by other events. The undisputed evidence before the Court is that the Debtor has had significant financial problems since the bankruptcy filing because of two unrelated, and unusual, employee problems. Both of these problems resulted in proceedings before this Court.[5] These problems, this Court finds, not only had a direct detrimental financial effect on the Debtor but that the effort, time and expense that the Debtor's principals and its attorneys had to expend to address these problems also detracted from the successful operation of the Debtor's business and from the attorneys' efforts to move this case to a successful conclusion.

The Debtor has made progress over the last bankruptcy year. Mr. Wells testified that the period immediately prior to the hearing was financially rewarding.[6] And

---

prepay the purchase price and thereby eliminate the Taylors from this matter. The Taylors agreed to the amended language but now object to its operation. They did not appeal the Court's ruling or amended order. This Court will not relitigate the issue now. Whether the Taylors are having second thoughts about the contract they entered with HSP or second thoughts about the language they submitted to the Court for the amended order, the contract remains in full force as does this Court's ruling on that contract. Whether that contract is now assumable is the only issue before this Court.

3. This Court of course relies on the memorandum opinion and accompanying order issued on April 13, 1995, in deciding the instant matter before the Court.

4. Mr. Wells testified that this was the sole reason for the filing. The Taylors did not offer any contrary evidence, although they argued that the Debtor's failure to pay them was an equal reason.

5. Pursuant to Rule 201 of the Federal Rules of Evidence, the Court takes judicial notice of its orders addressing both problems.

6. In the two weeks before the hearing, sales increased. Within the 10 days before the hearing, the Debtor received $45,000.00 in cash sales. On the other hand, the Taylors argued that the Debtor's failure to make timely payments to a prior landlord or to make payments to the Taylors during the bankruptcy, demonstrates that the Debtor does not have the ability to make future payments.

while the months of May and June show a loss in income due to one of the employee problems, net profits range from $9,000.00 to $33,000.00 per month for the preceding months. Because sales and orders were disrupted by both of the employee problems, several months must pass before the Debtor returns to profit status. This is the nature of the Debtor's business. Except in limited situations, when an order is placed with the Debtor, full payment is made at the time of the order. This procedure is justified because of the custom building nature of HSP's business, and the delay in a return to profit status is explained by the fact that the sales and order process was disrupted and that products take six to 11 weeks to produce. Because the most serious of the employees problems involved a salesman's soliciting of orders, completing those orders, taking payment for those orders and failing to advise the Debtor of the orders or remitting the funds received to the Debtor, the normal procedure was seriously disrupted. The Debtor found itself in a situation, once it discovered the problem, where it had late orders to fill but no money for those orders.

Mr. Wells testified that the property which HSP desires to continue to lease is the Debtor's manufacturing facility property. Mr. Wells assigns a fair market value to the property of $850,000.00 to $950,000.00. This value is consistent with this Court's earlier finding that Mr. Taylor testified that the property was worth $900,000.00.

As of the date of the hearing on this matter, HSP was negotiating with a publicly owned company, for the sale or merger of HSP. The general offer at that time was $850,000.00. A $50,000.00 earnest money payment to HSP was to be made. A letter of intent with HSP had been signed. If the restructuring is completed, HSP intends to exercise its option to prepay the amount owed to the Taylors and require the Taylors to convey title to the property.

The Debtor's current and potential orders indicate a likelihood of successful reorganization. Some of the larger projects in negotiation include a $212,000.00 order in North Carolina, similar projects in Michigan and Colorado for $95,000.00 and $92,000.00, a $260,000.00 project in Egypt and one with a potential of several millions in sales in Saudi Arabia. If these order are realized the Debtor expects to have between 1.6 million and 1.9 million dollars in sales but if none of these larger projects are realized the Debtor, according to the testimony of Mr. Wells, expects sales of between $950,000.00 and 1.1 million in 1995.

While the foreign projects may at first blush seem exotic, the Debtor's current manager, Mr. Joe Webb, hired by the Debtor for the purpose of debt reorganization, operated a manufacturing plant in Kuwait and retains business contacts in the Middle East. Mr. Webb's experience is considerable in the area of distressed companies. He has been working with such companies since 1955. He started with HSP as a consultant about 2 years ago and has for the last 7 to 8 months been a full time employee. He holds CPA certification and a MBA degree. His duties and accomplishments with HSP have included increasing sales and manufacturing, identifying major problems, and addressing employee relationships. Mr. Webb testified that he expects the foreign projects and the domestic projects to reach the concrete order stage shortly.

HSP has demonstrated its ability to manufacture products and to fill its orders during financially difficult times. Prior to the filing of this case, HSP had received approximately $300,000.00 in prepaid funds for products to be delivered at a later date. Since the bankruptcy was filed, HSP has manufactured and delivered all of the products represented by the prepaid funds.

The thrust of the Taylors' criticism of the Debtor's motion is that the Debtor has had financial problems in the past and that those will continue in the future. Principals for the Debtor admit that the Debtor has had financial problems. This of course is obvious in all chapter 11 bankruptcy filings. Mr. James Eubank, a personal CPA for the Taylors, was called as an expert witness and was asked by the Taylors to analyze the Debtor's current operating reports and to testify about the Debtor's prospects. Mr. Eubank testified that there was little assurance that the Debtor could pay the Taylors over the term of the

lease. Mr. Eubank's opinion however was based on, and his acquaintance with the Debtor's operation was limited to, the reports the Debtor has filed with this Court. Mr. Eubank did not investigate the physical plant, did not prepare a cash flow analysis of the Debtor's operations, did not consult with or meet with HSP management, is not familiar with industry standards, was not aware of what sales were required to produce a profit for the Debtor, and did not know the cost of operating the business. Mr. Eubank has had little experience in the general area of insolvency accounting and little knowledge in the specific aspects of this Debtor's business. His testimony that the Debtor's operating reports demonstrate the lack of ability to make future payments was given little weight by this Court in deciding this matter.[7]

The Taylors contend that HSP owes them interest on the unpaid loan balance and owes them for attorneys' fees and expenses from this and previous litigation. As to those issues, the parties agree on the facts. According to the Taylors' post-trial brief, the Taylors calculate the amount of interest, through July 10, 1995 as $62,887.50. The Debtor does not dispute the method of calculation of this interest and did not dispute the amount of interest claimed at the hearing, that of $58,050.00. The interest is calculated on an unpaid principal balance on the "lease-sale" contract of $516,000.00. The parties agree on this figure. The parties agree also that the Debtor owes the Taylors, as of the date of the hearing, $64,800.00 for 16 months of rent arrearage. The Debtor has not made a payment to the Taylors since March 1994. Since that time the Taylors have been required to make current payments under their arrangement with AmSouth Bank. The Tay-

lors have had to borrow significant funds in order to make those payments.[8]

This case was filed on July 6, 1994. HSP filed its Motion to Assume on May 9, 1995 after this Court granted extensions of time for filing such a motion. The extensions were granted while the parties waited for the outcome of a related adversary proceeding.

HSP proposes to cure all arrearage due the Taylors within 70 days of an order approving the assumption of the executory contract. HSP commits that it will make all future monthly payments under the contract as those payments become due.

## II. Contentions of Parties

The Debtor may assume an executory contract or unexpired lease if the requirements of 365(b)(1) are met. The Debtor contends that these requirements have been met and that the Court should approve the Motion to Assume Executory Contract.

The Taylors contend that:

1. Section 356(d) of the Bankruptcy Code prohibits the granting of more than one extension of time in which to assume an executory contract, that the Court's orders granting second and third extensions were void and consequently the contract was rejected as a matter of law because it was not timely assumed;

2. The requirements of section 365(b)(1) have not been met;

3. That if the Court allows the Debtor to assume the contract, the Debtor must pay the Taylors interest on the principal balance due; and,

4. That if the Court allows the Debtor to assume the contract, the Debtor must reimburse the Taylors for attorney's

---

7. Although the Court sustained an objection to the admissibility of a summary sheet produced by Mr. Eubank, a copy of that document was attached to the Taylors' post-trial brief. The sheet was not identified for the Debtor or the Court in accordance with the Court's Order Setting Final Pretrial Procedures. For this reason, the summary sheet was not allowed at trial and was not considered in deciding these issues.

8. The original arrangement between HSP and the Taylors required the Taylors to make a portion of each monthly payment to AmSouth Bank.

The Debtor's payments were structured such that its payments to the Taylors were less than those the Taylors were required to pay AmSouth. The Taylors were to make up the amount that exceeded the Debtor's payments. The parties did not explain the amount of the difference. For purposes of the matter, the Court will not attempt to calculate this difference and will rely of the parties agreed upon amount of $58,050.00. The Taylors contend that interest accrues at a rate of 161.25 per day.

fees expended in this and related litigation.

The Debtor contends that its motions for extension of time were all timely filed and were timely granted and that neither interest nor attorneys' fees should be allowed.

### III. Conclusions of Law

#### A. Extension of Time to Assume or Reject Contract

Did this Court committed error by granting the Debtor extensions of time to assume or reject the subject contract? [9]

■ As legal support for their arguments the Taylors' rely on *In re Horwitz*, 167 B.R. 237 (Bankr.W.D.Okla.1994); *In re House of Deals of Broward, Inc.*, 67 B.R. 23 (Bankr. E.D.N.Y.1986); and *In re Coastal Industries, Inc.*, 58 B.R. 48 (Bankr.N.J.1986). The courts deciding those cases recognized the minority view which is a court may not grant an extension of time for accepting or rejecting an executory contract beyond the initial 60 day period allowed in section 365(d). On the other hand, this Court adopts the majority view, as it is explained by the Court of Appeals for the Third Circuit in *In re Channel Home Centers, Inc.*, 989 F.2d 682 (3rd Cir.1993). The Circuit Court found:

> The primary question presented in this appeal concerns a bankruptcy court's authority to grant a second extension under Section 365(d)(4) more than 60 days after the order of relief. Relying heavily on the statutory language, Legacy contends that Section 365(d)(4) prohibits a bankruptcy court from granting any extension once the 60–day period ends. By contrast, the debtors maintain that this provision permits a bankruptcy court to grant a second extension at that time. This position is supported by the district court's decision in this case and all but one of the relevant published

decisions. *See In re American Healthcare Management, Inc.*, 900 F.2d 827 (5th Cir.1990); *In re Victoria Station, Inc.*, 875 F.2d 1380 (9th Cir.1989); *In re Advanced Electronics, Inc.*, 108 B.R. 53 (Bankr.M.D.Pa.1989); *Tigr Restaurant, Inc. v. Rouse S.I. Shopping Center, Inc.*, 79 B.R. 954 (E.D.N.Y.1987). *Contra In re Coastal Industries, Inc.*, 58 B.R. 48 (Bankr.D.N.J.1986).

*Id.* at 685. The circuit court concluded, "We thus agree with the result reached by the two other courts of appeals and all but one of the other courts that have considered this question. Accordingly, we hold that section 365(d)(4) did not bar the bankruptcy court from granting a second extension in this case." *Id.* at 688.[10]

This court accepts the majority view. The extreme factual circumstances that existed, at the time the Taylors contend this Court failed in its procedure, require this Court to find as a matter of equity, that HSP's executory contract was not rejected. These facts, as they began to evolve in an earlier stage of this litigation, reveal a situation that lead to the second extension of time.[11] The pertinent parts of that earlier hearing include:

> THE COURT: Mr. Rubin I hate to summon you back.

> MR. RUBIN: I didn't know you had but I tell you I had a premonition Your Honor. I was down talking to Lynda Matson checking on Judge Fulford and I just had a premonition, knowing Charlie Cleveland, that everything was not right so I just walked back here.

> THE COURT: Well, this is in the Health Science Products case—

> MR. RUBIN: Yes.

> MR. CLEVELAND: Yes.

> THE COURT: and here's the problem folks. Somebody, presumably one of

9. During the pendency of this case three members of this Court granted extensions of time for HSP to decide whether to assume or reject the executory contract.

10. *In re Southwest Aircraft Services, Inc.*, 831 F.2d 848, 851 (9th Cir.1987) *cert. denied*, 487 U.S. 1206, 108 S.Ct. 2848, 101 L.Ed.2d 885 (1988); *In re Victoria Station*, 875 F.2d 1380,

1383–1385 (9th Cir.1989); *In re American Healthcare Management, Inc.*, 900 F.2d 827, 830 (5th Cir.1990).

11. The first extension was granted within the initial 60–day, section 365(d) period. The Taylors do not contend that this extension was improper.

Judge Fulford's "people," brought this order in extending deadlines saying and as I recall, and I don't remember who brought it, and we have absolutely no paper trail, which is unusual, but this is not my file, saying this is all by agreement and it needs to be done immediately. And that's what I did because that's what I was told. I understand that Mr. Cleveland does not want it to say by consent. He wants it to say for good cause shown. Well—

MR. RUBIN: Well.

THE COURT: that's great, but nobody has shown me good cause....

MR. RUBIN: But.

THE COURT: I don't even have a motion in here asking for the extension, I just have an order.

MR. RUBIN: Can can I explain the facts to you.

THE COURT: I'd be happy for you to.

MR. RUBIN: Thank you. It was my idea by the way to amend the order and I was going to prepare an amendment and say the previous order was entered in error and for cause shown, etc. What happened was that we—uh there is a motion to lift stay pending that Mr. Cleveland filed on behalf of his client, Taylor, against Health Science Products. Subsequent to the filing of that motion we filed an adversary proceeding to avoid a transfer and for other relief. Judge Fulford consolidated both of those matters for trial on September 21. And at the previous hearing, and I have the order, extended the time within which to assume or reject executory contracts and leases as well as extended the automatic stay pursuant to section 365 until the trial date which is normal—we don't want the stay to lapse certainly. Judge Fulford, of course, became ill. And September 21st was a day in which he was in the hospital and so Tim Lupinacci in my office had a conversation with Mr. Cleveland and misunderstood Mr. Cleveland, we'll take the blame, and and what happened was that Lynda gave us a trial date of October the 21st thinking that Judge's condition would not be as it is and he would be back by then. And so and certainly preserving the automatic stay and

the time frames all we did was move those back until October 21. And that's all that's happened here. And we thought that there ought not to be any controversy about that. Uh because that was Judge Fulford's intent in the original order which is dated um August the 25th and I have a copy of it. I don't know that you do but you may, I don't know what you have there, but

THE COURT: Yes.

MR. RUBIN: There's an order dated August the 25th which does all of this. And moves it to September. And we just thought that that's such an uncontroversial issue that that it would be by consent. And certainly if Charles finds himself in an uncomfortable position and I can understand knowing his client after taking his deposition that he can't do it by consent. We're most happy to amend the order saying it was entered in error by consent but for cause shown these deadlines are extended.

THE COURT: I would just say for good cause. Don't say shown.

MR. RUBIN: Alright. For good cause.

THE COURT: We have no evidence or testimony.

MR. RUBIN: Alright.

THE COURT: Just say for good cause. Now while you're here, the other reason for—and if you get back to your office Mr. Rubin and they send you back, you've already been back. Cause there's a message there that when you get there to send you back.

MR. RUBIN: There probably frantic looking for me.

THE COURT: They probably are. I have been asked by Judge Fulford's Courtroom Deputy to advise you, and I am so doing this morning, the October 21st hearing is as of today continued.

MR. RUBIN: Okay.

THE COURT: Now, having said that—

MR. RUBIN: Well.

THE COURT: do you want it I mean I suspect that this is a case that Judge Fulford needs to hear when he returns be-

cause it sounds like to me he's already done the lion's share of the work. So do you want it continued generally, do you want us to go ahead and try to project a new date, what do you want us to do?

MR. CLEVELAND: My preference would be as for a new date. When do you expect Judge Fulford to be back?

THE COURT: That's a good question, Mr. Cleveland. Tomorrow if I had by druthers, but I don't.

MR. CLEVELAND: Yeah.

THE COURT: How long's this case going to take to hear when ya'll get to it?

MR. RUBIN: A day.

MR. CLEVELAND: Judge Fulford had set two days but I think we had talked about a day, but a full day, but he had allocated two days.

THE COURT: Is this a Chapter 7 or a Chapter 11?

MR. RUBIN: Chapter 11.

MR. CLEVELAND: Chapter 11.

MR. RUBIN: It's a rather complex question of law and there may be some dispute as to fact.

MR. CLEVELAND: There may be like um ...

THE COURT: I mean to be honest ...

MR. CLEVELAND: three or four witnesses, but I don't think they'll be long. I think they probably could get them in a day.

THE COURT: I assume that he's not gonna want a whole day trial until probably after the first of the year. Their saying that the surgery is postponed at least a week.

MR. CLEVELAND: I didn't know that. Yeah.

THE COURT: Assuming they do the surgery next week which is the 10th or 11th I think you're looking at at least— they told us to start with—at least a four week recovery period—that was after he's—now he's been in the hospital—will have been in the hospital five weeks.

MR. RUBIN: Yeah.

THE COURT: You're looking I think at a minimum of six weeks before he can come back. So we're now into mid to late November and my thought is that he's only going to be able to come back maybe half days to start. And I think it's going to be after January before he remotely has the strength to sit through—or has the inclination even—to sit through a one-day trial. So my thought is if I give you a date in January it's with the understanding that you know if he's back, great, if he's not, I mean that's all I know to do at this point.

MR. CLEVELAND: Judge, Judge, with that—with what you've just told me—I didn't know. I understood he was going to be back sooner than that and I didn't know his condition. But my client has a problem in that he's paying out $7,000 to $9,000 each month that goes by every first of the month which might be money down the drain and if it's going to be that long the I would want to ask for another judge if we could get it and a hearing sooner than after the first of the year.

. . . .

THE COURT: Alright. Then what— let's do this. Your trial date will be in the vicinity of October 21st. It may or not be on that date. And I will get the Clerk's Office to arrange it—either through our Courtroom Deputies. Somebody will hear this case. Either Judge Cohen, me, Judge Sledge or Judge Caddell. Somebody will hear the case sometime around the 21st.

MR. RUBIN: Good.

. . . .

THE COURT: And we'll let you know by telephone. Now do any of these date need to be moved again—these deadlines?

MR. RUBIN: Well I would think so actually.

THE COURT: In other words we have it—in other words you may need this beyond the 21st—

MR. RUBIN: Yeah.

THE COURT: if the hearing is not till the 21st.

MR. RUBIN: Yeah.

MR. CLEVELAND: Judge Fulford had picked the day that he put as the last day—

THE COURT: I understand that.

MR. CLEVELAND: that he had set for the trial.

MR. RUBIN: Let me make a suggestion—

THE COURT: I understand.

. . . .

THE COURT: and as soon as we get out of here this morning call whoever is going to do the amended order and if you need to change your deadline backwards to the 23rd or the 25th or whatever you can do that in the same order.

MR. RUBIN: Well I was going to suggest that since we don't know what the date is that ya'll prepare the order since you know what it is.

THE COURT: We may do that. We'll do one or the other Mr. Rubin.

MR. RUBIN: It would probably be quicker frankly.

THE COURT: Okay. We'll take care of it and in the order also advise you of the Court date and which courtroom.

MR. RUBIN: That will be fine.

THE COURT: Okay.

MR. RUBIN: Is that satisfactory now with you?

MR. CLEVELAND: Sure. Yeah.

THE COURT: Alright. Well I hate that I brought ya'll back but

MR. RUBIN: Well uh

THE COURT: We needed to

MR. RUBIN: I just had a premonition

THE COURT: Well we needed to get it straight anyway and also I wanted to make sure that we got the dates straight so—

MR. RUBIN: Alright. Thank you Judge.

THE COURT: Thank you.

Unofficial Transcript of Official Court Recording (emphasis added).

The Taylors' current position takes advantage of two situations that existed at that time. The above quoted material demonstrates the Court's perplexing situation. Judge Clifford Fulford was ill and could not work. The Debtor had filed a complaint which when addressed would decide whether there was an executory contract to assume or reject. Obviously, and regardless of the time involved, HSP could not make a determination about assumption until the underlying question was answered, that is, was the contact an executory contract.

The above quoted material demonstrates that the Taylors did not take advantage of the first opportunity they had to alert the Court and the Debtor that they intended to raise a technical objection to the Debtor's assumption of the executory contract.[12] The Court attempted to assist the parties by entering a consent order provided by the Debtor. That order, as it turned out was prepared in error by the Debtor. But, as the Court explained, a subsequent order was entered not by consent but without objection. At the end of the hearing when asked whether there was agreement about the matters discussed at that hearing, *both* counsel answered in the affirmative.[13] The Taylors now contend that the extension of time for assumption was invalid because it was not entered timely.

The Taylors were accommodated in their request to expedite the matters before the Court. Many litigants similarly situated were not. This matter was set for trial on October 25, 1994. The case was assigned to the undersigned and the October 25th trial was held. At that hearing the Taylors argued that the subject contract was executory. HSP argued that it was not an executory contract but a sale of real property. The pertinent part of the October 25 hearing transcript relating to the third extension of time to assume the contract reads:

THE COURT: I'm going to deny your motion for directed verdict. I can't in

---

**12.** Even if the Taylors had not at that time formed the intent to file such an objection, they should be estopped from making it now after failing to object when the Court extended the date.

**13.** While the Taylors filed an objection to the order extending the deadline for assumption by consent, the Court was clearly given the impression that the objection was based solely on the "by consent" issue and that there was no general objection to the extension.

good conscience rule on this without reading these documents.

MR. RUBIN: I understand.

THE COURT: And that in no way indicates that I have made a decision. I haven't. I need to read these documents. It wouldn't be fair to anybody without doing that. With that in mind, I think it's necessary that if you want to make your record with Mr. Wells, you also need to do that. But as I stated earlier, I am inclined to rule against the Motion for Relief from Stay based on Mr. Taylor's testimony that there is a substantial equity in the property. It's obviously needed for reorganization. At least at this point, if the debtor starts making payments, Mr. Taylor is adequately protected. If the debtor doesn't start making payments, then whatever adequate protection equity cushion there is there, it's going to erode fairly rapidly.

MR. RUBIN: Of course, the issue of whether we have to make payments is dependent on whether the transaction should or should not be avoided.

THE COURT: I understand that, and that's going to have to be decided before you start making those payments. But in terms of whether the stay remains in effect and allow the case to at least proceed somewhat, I'm inclined to rule against you on a Motion for Relief from Stay. But as you pointed out, your counterclaim has similar issues in it. And the ruling on the Motion for Relief from Stay is not going to answer all these questions. But I wanted to indicate that in order to let this case move forward, at least as far as the debtor is concerned.

MR. RUBIN: Well, the only testimony that I would elicit from Mr. Wells would be twofold; number 1, that the property is essential for an effective reorganization. But I don't think there's any dispute about that.

THE COURT: I don't think so either.

MR. RUBIN: I think it's the manufacturing facility, and it's the only facility we had. And Mr. Taylor even testified to that. The other thing he would have testified to, of course, is his understanding of the transaction, that it was to be a sale and

not a lease. And it was his intent that he would get good title. And, of course, that's directly opposite to the testimony.

Only other thing I have—I could put Mr. Wells on the stand for that purpose. The only other thing I have is one sort of housekeeping matter. On October 10, 1994, Judge Mitchell rendered an order in this case extending the deadline pursuant to an order entered on September 16th, granting an extension of deadlines until October 25th, which is today.

THE COURT: I've got a note to do something about that before we leave.

MR. RUBIN: Out of an abundance of caution, we would ask the Court to continue the stay in effect and the deadlines in effect until the Court makes a decision about what it wants to do.

THE COURT: If I rule on a Motion for Relief from Stay, I guess the stay, then, remains in effect.

MR. RUBIN: Yes, sir. I understand. I'm just trying to be careful. Thank you.

THE COURT: I guess if I find that this is a lease and not a sale, then you got to make your decision whether you want—

MR. RUBIN: But you have to continue the time within which—

THE COURT: Exactly.

MR. RUBIN: Yes, sir. Thank you.

THE COURT: Which I'll do before— well, I guess I can do that now, unless there's some objection, from Mr. Cleveland. But the deadline for assuming and rejecting leases should be extended, I guess, until some time that I rule on the proceeding today. Do ya'll suggest that we have a specific date for that, or can I do it generally?

MR. RUBIN: I guess you can do it generally.

MR. CLEVELAND: Judge, I think you could do whatever you want to do, but I don't want to be in a position of consenting to anything with reference to any extension of time.

THE COURT: I understand. Too frequently I get the response: "You can do anything you want to do." I don't neces-

sarily agree with that, and I don't think the people across the street or down the road do either. But without the consent, but not objecting, then, I will extend the deadline for assuming or rejecting the lease thirty days after the date I enter an order on this proceeding.

MR. RUBIN: That will be fine.

THE COURT: And that way you can both react to whatever I enter. And if it's a situation where you need to assume or reject the lease, you will have thirty days to do that.

MR. RUBIN: We call Mr. Wells.

THE COURT: Mr. Wells.

MR. WELLS, being first duly sworn, was examined and testified as follows:

THE CLERK: Please be seated and state your name for the record.

MR. CLEVELAND: Judge, I just want to say one thing with reference—before we start. We don't agree that they would even have a right if it's an executory contract to either accept it or reject it, but I just want that to show—

THE COURT: I understand. I guess if they do want to, they would file a motion to assume or reject, and then we would hear that. So let's say you would file your motion to assume or reject within thirty days after the date an order is entered on the proceedings today.

MR. RUBIN: If the Court rules it's a lease.

THE COURT: If the Court rules it's a lease.

Tr. 104–110 (emphasis added).

Based on this discussion, on October 25th the Court entered an order extending the time for assumption of the contract until 30 days following a ruling on the contract. Although given the specific opportunity to object, the Taylors did not. Similarly they did not take advantage of the second opportunity to alert the Court and the Debtor that they intended to raise a technical objection to the Debtor's assumption of the executory contract. Judge Fulford died on October 29,

1994, two days after the extension order was entered.

The Court eventually found in the Taylors' favor and held that the contract was executory. The Court and the Debtor did not know at that time however, that although the Taylors' substantive position was that the contract was executory, their future procedural position would be that the Debtor should not be given an opportunity to assume it. This is patently unfair as is the Taylors' current position, in light of their failure to object during appearances before the Court. Whether there would even be an executory contract for the Debtor to assume is not something the Court, the Taylors or the Debtor knew at the time the deadline was extended. How could the Debtor make any reasonable decision as to the assumption or rejection of the contract when it did not know whether the Court would find that there was a contract to assume or reject? As to the Taylors' first contention, the Court finds for the Debtor. The extensions were both legally and equitably correct. The Debtor's Motion to Assume Executory Contract was filed timely.[14]

### B. Motion to Assume Executory Contract

■ Section 365(b)(1) provides:

If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

---

**14.** There is no question that the extensions were procedurally entered in a timely manner. At no time was the Debtor without an order that extended the time for filing a motion to assume or without a pending and timely filed request for extension. See cases cited at Note 10 above.

11 U.S.C. § 365(b)(1).[15] The Debtor is, of course, the trustee for purposes of this section's application in a Chapter 11 case where no trustee has been appointed.

■■■ As to subsection (A) of section 365(b)(1), this Court finds, based on the facts of this case, that the Debtor's proposal to cure the arrearage owed the Taylors is adequate assurance that HSP will promptly cure the default. The proposal to cure the default within 70 days of an order allowing an assumption is, within the contexts of this case, prompt. The Debtor's current and projected financial conditions demonstrate the ability to make these payments. As subsection (C) of section 365(b)(1), this Court finds, based on the facts of this case, that the same ability to make current payments, along with the Debtor's projected financial stability, provides adequate assurance of future performance under the contract.[16]

Subsection (B) of section 365(b)(1) involves the issues of whether the Debtor must pay the Taylors interest and attorneys' fees in addition to curing the contract default. This subsection requires the payment of any actual pecuniary loss to a party resulting from a default under an executory contract or lease.

## C. Interest

■■■ In its claim for interest the Taylors rely on the cases of *In re Diamond Head Emporium Inc.*, 69 B.R. 487 (Bankr.D.Haw. 1987) and *In re Tech Hifi, Inc.*, 49 B.R. 876 (Bankr.D.Mass.1985). The rulings in these cases allowed interest in a lease situation but both involved interest on unpaid rent, a situation not involved here. The Taylors specifically are claiming interest on the unpaid principal balance, not on the arrearage amount. The Court has not considered the cited cases; however, the Court is of the opinion that the Taylors are entitled to interest under section 365(b)(1)(B). The Taylors have been required to make payments to AmSouth Bank regardless of whether HSP made payment to them. The Taylors borrowed money to make those payments. Those loans were of course not free and the Taylors thus suffered an actual pecuniary loss because of the Debtor's failure to pay them. These are actual out of pocket costs. But for the default, these payments would not have been required to be paid. The Taylors are entitled to what will make them whole. They may be entitled to interest on the unpaid rent but they have not asked for that. On the other hand they are probably not entitled to full interest on the unpaid balance. The original arrangement between HSP and the Taylors required the Taylors to pay a portion of each monthly payment to AmSouth Bank. The payments were structured such that the Debtor's payments to the Taylors were less than those the Taylors

---

**15.** When evaluating a request by a trustee or debtor in possession to assume or reject an executory contract or unexpired lease, most courts apply the "business judgment rule" and approve the decision unless there is bad faith or a gross abuse of discretion. *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043 (4th Cir.1985). As generally applied in corporate litigation, the rule means that courts should defer to decisions of corporate directors upon matters entrusted to their business judgment except upon a finding of bad faith or gross abuse of their business discretion. In bankruptcy litigation, the issue is presented for judicial determination when a debtor, having decided that assumption or rejection will be beneficial to the bankruptcy estate, moves for court approval. The issue thereby presented for determination by the bankruptcy court is whether the decision of the debtor is so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, whim, or caprice. That issue is one of fact to be decided by the bankruptcy court.

A few courts have declined to apply the business judgment rule and have instead adopted a "balancing of the equities test," under which the court ascertains whether rejection or assumption would disproportionately harm the nondebtor party in comparison with any benefit that might accrue to the general unsecured creditors of the debtor. *In re Washington Capital Aviation & Leasing*, 156 B.R. 167, 172 (Bankr.E.D.Va.1993); *In re Monarch Tool & Mfg. Co.*, 114 B.R. 134 (Bankr.S.D.Ohio 1990); *In re Logical Software, Inc.*, 66 B.R. 683 (Bankr.D.Mass.1986). Case Management Manual for United States Bankruptcy Judges, Federal Judicial Center p. 275 (1995). *See, In re Gardinier, Inc.*, 831 F.2d 974, 975 (11th Cir.1987).

**16.** While there was testimony on behalf of the Taylors that the Debtor has not offered adequate assurance of payment, no evidence was offered by the Taylors to refute the Debtor's principals' descriptions of HSP's current operation.

were required to pay AmSouth. The Taylors were to make up the amount that exceeded the Debtor's payments. The parties did not explain the amount of the difference. For purposes of the matter, the Court will not attempt to calculate this difference and will rely on the parties agreed upon amount of $58,050.00. The Taylors contend that this interest accrues at a rate of 161.25 per day. Whether the amount of the Taylors' actual losses because of their having to borrow money to make the payments is equal to the amount agreed upon as interest due on the principal balance, this Court neither has the facts nor inclination to decide.[17] In any event, the Court finds that the Taylors suffered an actual pecuniary loss as a result of HSP's failure to make its monthly payments and that HSP must compensate the Taylors for that loss.[18]

### D. Attorneys' Fees

 The Taylors claim attorneys' fees for this and previous litigation. The Taylors' claim is based solely on the promissory note given the Taylors by HSP. That note provides that in the event of default that HSP

17. There may have even been some built in interest in the monthly payments which would in turn be part of the arrearage owed and already being paid. Again this Court is not inclined to interfere in the parties' agreed upon amount. The amount is calculated on a formula included in the promissory note given by HSP to the Taylors.

18. Unlike the attorneys' fee claim discussed next, the *claim* of interest is not dependent on the parties' promissory note. The legal basis for the interest award is not the promissory note. The loss suffered by the Taylors is a pecuniary loss that does not require contractual support to exist.

19. One case cited by the Taylors, *In re Westworld Community Healthcare, Inc.,* 95 B.R. 730 (Bankr. C.D.Cal.1989), holds that section 365(b)(1)(B) creates an independent right to attorneys' fees. The court in *In re Ryan's Subs, Inc.,* 165 B.R. 465 (Bankr.W.D.Mo.1994) points out:

Against that one holding, [referring to *Westworld*] the vast majority of cases have found that section 365(b)(1)(B) does not provide an independent right of recovery without regard to the terms of the lease or contract. *See, e.g., In re Child World, Inc.,* 161 B.R. 349, 353 (Bankr.S.D.N.Y.1993); *In re F & N Acquisition Corp.,* 152 B.R. 304, 308 (Bankr.W.D.Wash. 1993); *In re Hillsborough Holdings Corp.,* 126 B.R. 895, 898 (Bankr.M.D.Fla.1991); *In re*

will pay all costs of "collecting, securing, or attempting to collect or secure this Note, including reasonable attorneys' fees...." While there was a default, this Court does not believe that the promissory note provision activates the award of attorneys' fees in this case; however if it does this Court finds that the fees claimed should not be allowed.

 The Taylors argue that the majority of cases recognize that if a contract provides for attorneys' fees that a debtor must pay those fees as a requirement to assuming the contract. This is the majority position; however, it is a position that presupposes that the attorneys' fees incurred relate to the contract clause that allows them to be paid.[19] This is not the situation in this case. The fees could not be characterized as relating to "collecting, securing, or attempting to collect or secure ..." the promissory note and would not satisfy the approval requirements established by the Court of Appeals for the Eleventh Circuit for attorneys' fees requests.[20] This Court finds that the requests for fees is due to be denied.

The Taylors claim of attorneys' fees reads:

*Joshua Slocum, Ltd.,* 103 B.R. 601, 607–08 (Bankr.E.D.Penn.1989); *In re Westview 74th Street Drug Corp.,* 59 B.R. 747, 756–57 (Bankr. S.D.N.Y.1986); *In re Tech Hifi, Inc.,* 49 B.R. 876, 881 (Bankr.D.Mass.1985); *Andrew v. KMR Corp.* (*In re Bullock*), 17 B.R. 438, 439 (Bankr. 9th Cir.1982).
*Id.* at 468 (parenthetical added).

20. Section 330(a) of Title 11 of the United States Code provides that the bankruptcy court may award reasonable compensation for actual, necessary services rendered by a trustee, examiner, and professional person employed in various capacities under the Bankruptcy Code. No one has objected to the fees requested; however, the determination of "reasonable" fees for services rendered in connection with the administration of bankruptcy cases is a judicial function, a responsibility which a bankruptcy judge affirmatively exercises, regardless of whether or not the fees requested in a particular instance are actually opposed by any party in interest. *See, In re First Colonial Corp. of America,* 544 F.2d 1291 (5th Cir.1977). And regardless of any action by a party in interest, the bankruptcy court has the authority to hold an evidentiary hearing on its own motion if petitions for compensation do not adequately develop the factual basis of a fee award. Similarly, if no objections are raised by parties-in-interest, including the Bankruptcy Administrator, the court retains the authority to

in attempting to collect the note include: Cleveland & Cleveland $12,595.00 attorneys' fees and $774.39 expenses, for a total of $13,369.39 (Creditor's Ex. 14); Corretti & Newsom $1,062.50 attorneys' fees and $224.80 expenses for a total of $1,287.30 (Creditor's Ex. 13); and Helton & Dillard, CPA, $1,726.75 (Creditor's Ex. 10). These costs total $16,393.44.

Taylor's Post Trial Brief in Opposition to HSP's Motion to Assume Executory Contract at 4.

 Section 330(a) of the Bankruptcy Code provides that the bankruptcy court may award reasonable compensation for actual, necessary services rendered by a trustee, examiner, and professional person employed in various capacities under the Bankruptcy Code. In making those determinations the

Circuit Court of Appeals for the Eleventh Circuit requires:

In determining attorney's fees, a judge must 1) determine the nature and extent of the services rendered; 2) determine the value of those services; and 3) consider the factors laid out in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974) and explain how they affect the award. *Matter of First Colonial Corp. of America*, 544 F.2d 1291, 1299–1300 (5th Cir.), *cert. denied sub nom., Baddock v. American Benefit Life Ins. Co.*, 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977). In the bankruptcy context, the judge must also consider whether the bankruptcy assets were administered as economically as possible and whether any of the services rendered were duplicative or non-legal. *Matter of U.S. Golf Corp.*, 639 F.2d 1197, 1201 (5th Cir.1981). Bankruptcy judges

award only reasonable compensation for actual and necessary services. *In re Marker*, 100 B.R. 569 (Bkrtcy.N.D.Ala.1989).

As described in *In re First Colonial Corp. of America*, 544 F.2d at 1299, and its progeny, *Matter of U.S. Golf Corp.*, 639 F.2d at 1201, *In re Beverly Mfg. Corp.*, 841 F.2d 365, 370 (11th Cir. 1988), and *Grant v. George Schumann Tire & Battery Co.*, 908 F.2d at 877, determining a reasonable fee in bankruptcy is a three step process.

First, the bankruptcy judge must ascertain the nature and extent of the services supplied by the applicant. To that end, each applicant seeking compensation must file a statement which, in essence, recites the number of hours worked and which contains a description of how each of those hours was spent. If there are disputed issues of fact relating to the application, an evidentiary hearing must be held.

Second, once the nature and extent of the services have been determined, the bankruptcy judge must access the value of those services, that is the reasonableness and necessity of the hours claimed and the hourly rate requested. A determination of the reasonableness and necessity of hours and rates requires consideration of the twelve factors first enunciated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 171–719 (5th Cir.1974), a civil rights case, and made applicable to fee determinations in bankruptcy in *In re First Colonial Corp. of America*, 544 F.2d at 1298–1299. These are: (1) The time and labor required; (2) The novelty and difficulty of the questions; (3) The skill requisite to perform the legal service properly; (4) The preclusion of other employment by the attorney due to acceptance of the case; (5) The customary fee; (6) Whether the fee is fixed or contingent; (7) Time limitations imposed by the client or other circumstances; (8) The amount involved and the

results obtained; (9) The experience, reputation, and ability of the attorneys; (10) The "undesirability" of the case; (11) The nature and length of the professional relationship with the client; and, (12) Awards in similar cases. *Matter of U.S. Golf Corp.*, 639 F.2d at 1201; *Grant v. George Schumann Tire & Battery Co.*, 908 F.2d at 877. A reasonable fee may then be determined by multiplying the reasonable hourly rate by the number of hours reasonably expended. *Grant v. George Schumann Tire & Battery Co.*, 908 F.2d at 874.

Third, once the amount of reasonable compensation has been determined, the bankruptcy judge must briefly explain the findings and reasons upon which the award is based, including an indication of how each of the twelve factors affected the decision. *In re First Colonial Corp. of America*, 544 F.2d at 1300; *Matter of U.S. Golf Corp.*, 639 F.2d at 1202; *Grant v. George Schumann Tire & Battery Co.*, 908 F.2d at 878.

The purpose of the last requirement is to make the review of the fee determination meaningful. What is expected is "... not a meaningless exercise in parroting and answering each of *Johnson's* twelve criteria, but some assurance that the court has arrived at a just compensation based upon appropriate standards." *Matter of U.S. Golf Corp.*, 639 F.2d at 1206, quoting, *Davis v. Fletcher*, 598 F.2d 469, 470–71 (5th Cir.1979). However the "court's order on attorney's fees only need be specific enough to allow meaningful review...." *Grant v. George Schumann Tire & Battery Co.*, 908 F.2d at 878, n. 10. Even though a bankruptcy court's fee determination may not explicitly state which of the findings was made pursuant to which of the twelve factors, the fee determination is sufficient if it is otherwise "clear that the court considered those factors." *Id.*

and district courts have broad discretion in determining attorney's fees for bankruptcy proceedings; the exercise of that discretion will not be disturbed absent abuse of discretion. *Matter of First Colonial,* 544 F.2d at 1298. Bankruptcy and district court judges may abuse their discretion by failing to apply proper legal standards, by failing to follow proper procedures, or by basing the award on findings of fact that are clearly erroneous. *Id.* *Grant v. Schumann Tire & Battery,* 908 F.2d 874, 877–878 (11th Cir.1990). *See also Loranger v. Stierheim,* 10 F.3d 776 (11th Cir. 1994).

In determining the nature and extent of services rendered, the Court finds that the services performed by Cleveland & Cleveland were not actual and necessary to the "collecting, securing, or attempting to collect or secure ..." the promissory note. The fee application does not provide sufficient information for this Court to perform an hour by hour analysis, but the Court is familiar enough with the major categories of work performed in the case to make an informed decision about the fee request.[21] The majority of work performed was in the adversary proceeding of Health Science Products, Inc. v. Jim Taylor (A.P. No. 94–00295) where the Debtor filed a complaint to avoid a preferential transfer which it claimed was associated with the subject property. The Taylors filed a counterclaim but all of the work involved was associated with the determination of whether the contract between the Taylors and the Debtor was a lease or a sale, and if a lease, whether it was an executory contract that the Debtor could assume. While loosely related to the promissory note, the work performed by the Taylors' attorneys was not in an attempt to collect or secure the promissory note.[22]

The Taylors did file a motion for relief from stay to acquire the property which would be directly related to the promissory note; however, the work on that motion was subsumed in the adversary proceeding, and the motion was denied, without any significant litigation, as part of one of this Court's rulings in the adversary proceeding.[23]

In a case factually similar to this one, The United States Bankruptcy Appellate Panel of the Ninth Circuit carefully explained the significance of attorneys' fee requests under section 365. Bankruptcy Judge Calvin Ashland, of the Bankruptcy Court for the Central District of California, wrote for the panel:

### B. Fee Shifting In Bankruptcy

The legislature is the entity that is authorized to reallocate the fees in federal court. *Alyeska* [*Pipeline Service Co. v. Wilderness Society* ], 421 U.S. [240] at 247, 95 S.Ct. [1612] at 1616–17 [44 L.Ed.2d 141 (1975) ]. We therefore turn to the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure to see if there is a specific provision which allows the fees to be shifted from the prevailing party to the losing party. "What Congress has done, however, while fully recognizing and accepting the general rule, is to make specific and explicit provisions for the allowance of attorneys' fees under selected statutes granting or protecting various federal

---

21. From conducting most of the litigation in this case and from a review of the court docket in the case and its related adversary proceedings, the Court, having considered the *Johnson* 12 factors determines that: (1) the time and labor required to perform the services listed were not extraordinary; (2) there were no novel but there were difficult legal questions; (3) the applicant demonstrated the skills necessary to perform the legal services properly; (4) the applicant was not precluded from other practice because of this matter; (5) the applicant's fee was similar to the customary fees for similar work in the community; (6) the fee in this matter was fixed not contingent; (7) there were time limitations on the applicant due to the consideration of the requirement on the Taylors to make current payments;

(8) the debt amounts involved, and the results obtained, in this case were similar to other cases; (9) the experience, reputation and ability of the applicant are exemplary; (10) the case was not undesirable; (11) the applicant's relationship with his clients was not a factor; (12) the award is similar to awards in similar cases.

22. The work performed from a common sense perspective is simply not the type of action a state court law suit would envision to collect or secure a promissory note.

23. The Taylors of course filed an Objection to the Motion to Assume Executory Contract and work was performed in that regard.

rights." *Alyeska,* 421 U.S. at 260, 95 S.Ct. at 1623. "Congress itself presumably has the power and judgment to pick and choose among its statutes and to allow attorneys' fees under some, but not others." *Alyeska,* 421 U.S. at 263, 95 S.Ct. at 1625. The Alyeska court concluded from the selective treatment of attorneys' fees that where an award of attorneys' fees is not expressly authorized they should be denied. In the absence of such a fee shifting provision, the American Rule will not permit the fees to be reallocated.

Congress has created attorneys' fees provisions in some statutes. For example, § 362(h) allows for the payment of attorneys' fees for willful violations of the automatic stay. *Havelock v. Taxel (In re Pace),* 159 B.R. 890, 902 (9th Cir. BAP 1993); 11 U.S.C. § 362(h). Section 506(b) is another section which provides for the payment of an over-secured creditor's attorneys' fees if their agreement so provides. However, Lincoln cites to no similar provision or legislative history surrounding either § 547 or § 365. Based upon the record before us, we do not find support for an award of attorneys' fees under either § 547 or § 365.

2. Contractual Attorneys' Fee Clause

Lincoln relies upon the attorneys' fees clause in the lease agreement with LCO as a basis for charging LCO with the attorneys' fees incurred in defending the preference litigation. While it may be true that attorneys' fees are recoverable if they are linked to litigation seeking to enforce a contract, these fees were not so incurred. "(W)hile both contracts provided for attorneys' fees, this action was not one for the enforcement of the contracts." *Collingwood Grain, Inc. v. Coast Trading Company, Inc. (In re Coast Trading Company, Inc.),* 744 F.2d 686, 693 (9th Cir.1984).

This litigation was based wholly in bankruptcy law, as preferential transfers are not avoidable outside the bankruptcy context in the same way that they can be recovered under 11 U.S.C. § 547.

[T]he applicability of the bankruptcy laws to particular contracts is not a question of enforceability of a contract but rather involves a unique, separate area of federal law. Absent bad faith or harassment, attorneys' fees are not available for the litigation of federal bankruptcy issues under a contract which provides for attorneys' fees for enforcement of the contract.

*Coast Trading,* 744 F.2d at 693. *See, In re Fulwiler,* 624 F.2d 908, 910 (9th Cir.1980) (per curiam).

Here, the litigation surrounded the recovery of LCO's payments to Lincoln. Lincoln points to *Stitt v. Williams,* 919 F.2d 516 (9th Cir.1990) and *United States ex rel. Reed v. Callahan,* 884 F.2d 1180 (9th Cir.1989), *cert. denied,* 493 U.S. 1094, 110 S.Ct. 1167, 107 L.Ed.2d 1069 (1990), for the proposition that any litigation which involves an enforceable contract necessarily is bound by that contract's attorneys' fees provisions. The flaw in Lincoln's reasoning is their failure to recognize the difference between litigation based upon the contract (Stitt & Callahan) and litigation which is not based upon the contract (Alyeska). The asserted rationale for recovery of the pre-petition payments was unique to bankruptcy. This recovery was not based upon fraud or RICO violations in the formation and administration of a partnership, as was the litigation in *Stitt.* This recovery was also not based upon the Miller Act, an Act which has long been held to require the application of state law. *Callahan,* 884 F.2d at 1185. Rather, this recovery was based wholly upon bankruptcy provisions. We, therefore, hold that this was not an action under the contract which gives effect to the attorneys' fees clause in the contract.

3. Section 365(b)(1)(B)

Lincoln relies upon § 365 as the source allowing the awarding of attorneys' fees in the bankruptcy context. Section 365 states:

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

. . . .

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default;

. . . .

11 U.S.C. § 365(b)(1)(B).

Lincoln asserts the requirement that "the trustee ... compensate ... a party ... for any actual pecuniary loss resulting from such default" includes attorneys' fees. However, the § 547 litigation was not the result of LCO's default under the lease, as Lincoln asserts, but rather was the result of the application of bankruptcy laws to payments made by LCO to Lincoln. These payments could have been pursued by the trustee whether there was a default under the lease, a payment made on a car purchase agreement, or the payment of a state court judgment. These actions were not pursued solely due to LCO's default.

Had the trustee prevailed in the § 547 preference action, § 365's cure provisions would have required the repayment of the expunged preference payments prior to assumption of the lease. The necessity of repaying the preferences was certainly an underlying motivation for refusing to classify the prepetition payments made under an assumed contract as avoidable preferences under § 547, when the avoidable preferences would have to have been repaid upon assumption. The reasoning of the BAP and the Ninth Circuit in reversing the classification of these payments as avoidable preferences is only relevant here to demonstrate that the litigation was bankruptcy law related and not related to enforcement of the underlying contract. Section 365(b)(1)(B) does not encompass the attorneys' fees at issue in this appeal.

*In re LCO Enterprises, Inc.*, 180 B.R. 567, 570–571 (9th Cir. BAP 1995).

Similar to the above, the contest between the Debtor and the Taylors on the issue of who owned the subject property, could have,

and probably would have occurred, without a default in the contract. This Court finds that the fees claimed should not be approved and are not actual pecuniary losses the Debtor is required to compensate in order to cure its default under the executory contract.[24]

## IV. Conclusion

The Court finds that the Motion to Assume Executory Contract is due to be granted as all requirements of section 365(b)(1) have been met or will be met when the Debtor pays the Taylors as ordered below.

It is therefore **Ordered** that:

1. The Motion to Assume Executory Contract was timely filed and the extensions granted on that motion were proper;

2. The Motion to Assume Executory Contract is **Granted;**

3. The Objection to Debtor's Motion to Assume Executory Contract is **Overruled;**

4. In order to cure the default under the lease the Debtor shall:

 (a) pay the Taylors $64,800.00, the amount of unpaid rent since March 1994, to the date of the hearing, and any amount accruing since the hearing, within 70 days of the date of this order; and,

 (b) pay the Taylors for their actual pecuniary losses which consists of interest on the principal debt due, which was $58,050.00, at the time of the hearing, plus the amount accruing since the hearing, within 70 days of the date of this order;

5. The Debtor shall not be liable for any attorneys' or other professionals' fees in this matter; and

6. If the Debtor does not meet its obligations as outlined in Paragraph 4 above, the Motion to Assume Executory Contract is denied on the 71st day fol-

---

**24.** The fees claimed by Helton and Dillard, CPA related directly to Mr. Eubank's testimony in this matter. Like the attorney fees requested, these fees are not related to collecting or securing the promissory note, especially in light of this Court's decision to give little weight to Mr. Eubank's testimony.

lowing the date of this Order without further notice or order from this Court.