**In re ENTERTAINMENT, INC., Debtor.**

**Bankruptcy No. 96 B 22240.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Aug. 3, 1998.

Laurence H. Kallen & Chester H. Foster, Jr., Foster & Kallen, Chicago, IL, for Debtor.

Paula K. Jacobi, Schwartz, Cooper, Greenberger & Krauss, Chicago, IL, for Blazer Builders and Michaels Consulting.

Howard M. Cohen, Scott Schreiber, Much Shelist, Chicago, IL, Marc C. Smith, Smith & Herzog, Marc S. Lipinski, Griffin Hoeffler, Chicago, IL, for Other Interested Parties.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING TRIAL ON MONARCH'S ADMINISTRATIVE CLAIM

JACK B. SCHMETTERER, Bankruptcy Judge.

Debtor Entertainment, Inc. ("Entertainment" or "Debtor") filed a petition under Chapter 11 of the Bankruptcy Code to reorganize its debts, and a Plan to do so was confirmed. Pursuant thereto, Blazer Builders, Inc. ("Blazer") and Michaels Consulting,

Inc. ("Michaels") undertook control of Debtor and payment of its administrative debt arising out of the bankruptcy.

Monarch Asphalt Co. ("Monarch") is Debtor's lessor of the site on which it operates. It filed an administrative claim here for payment of legal and related expenses asserted to have arisen under the lease during pendency of the bankruptcy case. Blazer and Michaels ("Respondents") objected, the issues were tried before this Court, and the parties rested. Final argument was submitted in writing through filings of proposed Findings of Fact and Conclusions of Law.

The following Findings of Fact and Conclusions of Law are now made and entered based on the evidence:

## FINDINGS OF FACT

1. Monarch is and at all times mentioned herein was an Illinois corporation. The Debtor is and at all times mentioned herein was an Illinois corporation. The Debtor filed its Chapter 11 petition herein on August 23, 1996.

2. Monarch and the Debtor entered into a written lease dated July 21, 1995 ("the Lease"), for rental of the premises commonly known as 11545 West Grand Avenue, Northlake, Illinois (the "Leasehold Premises"). At all times following its bankruptcy filing, Debtor occupied the Leasehold Premises as its place of business operating a so-called "gentleman's club." The recently confirmed Plan of reorganization provided for assumption of the Lease, and Debtor continued to occupy the Premises after confirmation in the operation of its business.

3. The Debtor paid rent that came due after the bankruptcy was filed for the Leasehold Premises through December 31, 1997. Post-bankruptcy rent charges continued to accrue under terms of the Lease for the period from and after January 1, 1998, and also under terms of this Court's orders of October 22, 1996, December 26, 1996, and January 24, 1997.

4. Blazer, Michaels, and Monarch, through their respective counsel, have stipulated that Monarch was entitled to receive post-bankruptcy rent payments for the period from and after January 1, 1998, and continuing through such time as the subject lease was assumed or rejected, as long as the Debtor continued to occupy the Leasehold Premises as it has done.

5. Debtor has paid post-bankruptcy real estate taxes for the Leasehold Premises through December 31, 1997. Post-bankruptcy real estate taxes accrued for the period from and after January 1, 1998, under terms of the Lease and pursuant to the orders entered October 22, 1996, December 26, 1996, and January 24, 1997.

6. Monarch filed a proof of claim for pre-bankruptcy Lease charges in the amount of $126,729.92. These pre-bankruptcy charges were itemized in Monarch's proof of claim as: (a) rent—$25,370.97; (b) property taxes—$89,872.43; (c) late charges—$7,150.00; and (d) attorney's fees and costs—$4,336.52. These were owed under Lease Articles 5 (rent), 6 (late charges), 22 (property taxes), and 29 (attorney's fees and costs).

7. Due to reproration of real estate tax charges (based on the 1996 real estate tax bill for the premises), the Debtor was entitled to a credit of $7,722.15 against Monarch's pre-petition claim, leaving a balance of $119,007.77 due and owing.

8. On June 25, 1997, an order was entered in this case requiring that objections be asserted to any claims other than administrative claims by July 18, 1997.

9. Blazer, Michaels, and Monarch, through their respective counsel, stipulated that the net $119,007.77 due and owing to Monarch for pre-petition charges was due as of the date the Debtor filed its bankruptcy petition on August 23, 1996.[1]

10. No objection was filed to Monarch's claim for pre-petition charges; accordingly, this claim in the net amount of $119,007.77 was and is deemed allowed.

11. Four remaining issues under the Lease were disputed between the parties at trial, namely (1) Attorney's fees sought by Monarch as "costs of collection" of its claims;

1. See transcript of proceedings held January 5, 1997.

(2) attorney's fees sought by Monarch for seeking to enforce "compliance with Lease obligations"; (3) attorney's fees incurred to recover claimant bankruptcy attorney's fees and interest on prepetition debt; and (4) the amount of interest to be recovered by Monarch on its pre-petition claim. The parties have stipulated to reasonableness of hourly rates charged by Monarch's attorneys; and so the issues here are over whether each asserted claim is compensable under the Lease, and, if so, whether it qualifies as an administrative claim.

### Lease Terms Applicable to Remaining Issues

12. Article 5 of the Lease states that $12,500 is the monthly rent from August 1995 through July 31, 2000, and that the monthly rent thereafter increases 3 percent each year. Monarch Exhibit 1.

13. Article 6 of the Lease states that
[t]he failure to pay any rent due hereunder by the 5th day of the month shall cause the assessment against Lessee of a late charge equal to the *greater of* five percent (5%) of the monthly rental or Fifty dollars ($50.00) per day, beginning on the 6th day after the due date.
Monarch Exh. 1 at p. 3 (emphasis added).

14. Article 22 of the Lease provides that Lessee shall be liable for all real estate taxes and assessment levied or assessed upon or with respect to the Premises. Lessee shall also be liable for any license fees incurred or required for operation of its business.
Monarch Exh. 1 at p. 3.

15. Under Article 29 of the Lease,
Lessee agrees to pay all *costs of collection,* including reasonable attorney fees, if all or any part of the rent reserved herein is sought to be collected after maturity with the aid of an attorney; *also to pay reasonable attorney fees and other attendant costs* in the event that it becomes necessary for the Lessor to employ an attorney *in order to enforce compliance* with any of the covenants, obligations, or conditions imposed by this Lease, provided that Lessee shall not be obligated to pay Lessor's

attorney's fees if Lessee is the successful party in any litigation. All sums due Lessor pursuant to this Lease Agreement are without relief from valuation and appraisement laws.
Monarch Exh. 1 at p. 9 (emphasis added).

16. Article 32 of the Lease states that
[a]ny monies owed by Lessee to Lessor shall, after due date, bear interest at the rate of eighteen percent (18%) per annum payable on demand.
Monarch Exh. 1 at p. 9.

17. The Lease contains no provision that expressly requires Debtor to pay expenses incurred by Monarch in protecting and asserting its claims in any bankruptcy proceeding, nor does the Lease exclude such expenses.

### Automatic Stay

18. The automatic stay under § 362 of the Bankruptcy Code (the "Code") barred Monarch from undertaking any bankruptcy "act to collect ... a claim against a debtor that arose before the commencement of the case...." Although Monarch sought on motion to modify the automatic stay so that it could proceed to collect the Monarch pre-petition claim in state court, the automatic stay with respect to Monarch and/or the Monarch pre-petition claim was not modified or vacated.

### Fees Sought by Monarch "to Enforce Compliance" with Lease Obligations

19. Monarch argues that it was necessary for it to employ counsel under Article 29 to enforce compliance with the covenants, obligations, or conditions imposed by the Lease in connection with the Debtor's failure to make bankruptcy payments of rent (Lease—Article 5), and real estate tax charges (Lease—Article 22) in connection with the Debtor's non-performance or threatened non-performance of its obligations to pay utility charges (Lease—Article 11), and to maintain insurance (Lease—Article 36). For this work, Monarch seeks $6,330.00 in fees and $121.11 in expenses.

20. Blazer and Michaels acknowledged $1,611.00 of the fees claimed, but none of the expenses. The contested parts of the lawyer's work for Monarch pertain to part of its attorney's fees and disbursements related to rent, real estate taxes, and insurance obligations under the Lease. Exh. 43.

21. Assertedly to enforce the rent, real estate tax, and insurance clauses of the lease, Monarch prepared and filed the following motions: (a) motion to lift the automatic stay or for adequate protection under § 362 of the Bankruptcy Code, filed on August 30, 1996 (Monarch Exh. 11); (b) amendment to motion to lift the automatic stay, filed on September 6, 1996 (Monarch Exh. 12); (c) motion for adequate protection under § 362 of the Bankruptcy Code, filed on October 3, 1996 (Monarch Exh. 15); and (d) motion for adequate protection, filed on November 4, 1997 (Item Nos. 209 and 209A on the docket sheet, Monarch Exh. 10).

22. Monarch had good cause to be immediately concerned about the Debtor's post-petition use and occupancy of the Leasehold Premises. As Blazer and Michaels admitted in the Joint Disclosure Statement filed on August 21, 1997 (Monarch Exh. 28), the Debtor was "delinquent in its rental payments" and "did not have funds to cure the lease defaults" at the time it filed its bankruptcy petition. Monarch Exh. 28 at p. 6. Moreover, principals of the Debtor were then at odds, a relationship that became even worse in bankruptcy and threatened to jeopardized viability of the business.

23. The delinquency in rental payments continued after filing of the Debtor's bankruptcy petition. In response to Monarch's initial motion of August 30, 1996, Debtor then admitted that it had failed to offer or make post-bankruptcy rent payments. Monarch Exh. 11 at ¶ 4; Monarch Exh. 12 at ¶ 4. The evidence as well as the contents of the court Order of September 10, 1996 (Monarch Exh. 14) reflect that the first specific commitment by Debtor to pay post-bankruptcy rent by a time certain did not occur until after the August 30 motion was filed and entry of the September 10 Order by Judge Sonderby, who then presided.

24. The September 10, 1996, Order required that Debtor pay rent for the period from the filing of the petition through September 30, 1996, and that such payment be made on or before September 30, 1996, but did not provide for any subsequent period. Debtor ultimately paid the delinquent August, September, and October 1996 rent payments, but was late in doing so.

25. In preparing and prosecuting its October 3, 1996, motion for adequate protection, Monarch played a direct role in obtaining the agreed October 22, 1996 Order (Monarch Exh. 18) which granted Debtor an extension of time through December 31, 1996 to assume or reject the Lease conditioned upon: (a) the Debtor's making of timely payment of its monthly rent; (b) the Debtor's payment of accrued real estate taxes for the period from the filing of the petition through October 31, 1996; and (c) the Debtor's continued payment of accrued real estate taxes on a monthly basis thereafter. The October 3 motion was thereby reasonable, necessary, and effective in protecting Monarch's interests and also to preserve Debtor's valuable leasehold rights.

26. With respect to real estate taxes, the position advocated by Monarch in its October 3, 1996, motion was adopted under terms of the October 22, 1996 Order.[2] Work to obtain that Order was a necessary precaution to police and enforce Monarch's rights under the lease and also to preserve Debtor's valuable leasehold rights, even though Debtor had no specified lease obligations to pay estimated real estate taxes on a monthly basis. Since Debtor was delinquent in rent and had an obvious cash flow problem, requests for an order to make monthly tax deposits was a reasonable step "to enforce" the real estate obligation.

27. With respect to insurance, Monarch received a notice of cancellation or nonrenewal of the Debtor's insurance for the Lease-

---

2. Under terms of the October 22, 1996, Order, the Debtor was to pay monthly real estate taxes estimated at 100% of the charge for the preceding year, to provide adequate protection, assur-ing that this charge would be paid even if the Debtor were later to cease activity and convert this case to one under Chapter 7.

hold Premises. The notice indicated that cancellation or non-renewal would be effective at 12:01 A.M. on October 19, 1996. The Debtor's continued operation of an alcohol bar on the Leasehold Premises without insurance would have exposed Monarch to liability as lessor and owner and would have exposed the Debtor's estate to administrative claims. In the nick of time, Debtor filed and presented a motion on October 17, 1997 (less than 48 hours before its insurance expired) for authorization to enter into insurance policy contracts, which authorization was then granted.

28. Monarch's vigilance was consistent with enforcement of the Lease insurance clause and provided a benefit to the Debtor's estate because it pressured Debtor to obtain insurance, thereby protecting the estate from risk of administrative claims. Monarch's November 4, 1996, motion for adequate protection was precipitated by its receipt of a notice bearing a mailing date of October 22, 1996, which stated that the Debtor's insurance had been canceled three days earlier, on October 19, 1996. While the motion was withdrawn after proof of insurance was provided, it was appropriate for Monarch to commence Lease enforcement action based on the notice, and the Debtor's estate was protected from risk by such vigilance, even though it appears that Debtor did not actually lose its insurance coverage.

29. Of the work for which Monarch seeks the $6,330.00 to "enforce compliance," much was reasonable and necessary to enforce Monarch's Lease rights and to protect its interest and interest of the estate through proper adherence to requirements of its valuable lease. However, Monarch's effort to oppose payment of a retainer for Debtor's counsel is argued to have been out of concern that the fee payment would undermine Debtor's ability to make post-petition Lease payments, but that concern about cash flow was not proved to have been well founded, and the work thereby performed will not be allowed as part of fees incurred "to enforce compliance."

30. Moreover, even where related in some way to the allowed work, attorney's fees cannot be assessed against Debtor under the Lease for ordinary work to represent Monarch in bankruptcy whereby its counsel (i) obtained a copy of the bankruptcy docket, (ii) made telephone calls and sent correspondence to learn the bankruptcy status, (iii) obtained copies of documents from the court file, (iv) reviewed the bankruptcy petition, schedules, and docket, and (v) obtained miscellaneous information. Such work was part of a prudent effort to represent Monarch in bankruptcy, but not closely enough related to efforts to enforce Monarch's Lease rights. Any hours of such work within time sought for this part of the application must be disallowed.

31. Since the petition date, it is true that largely under the prod of Monarch's vigilant efforts the Debtor paid it $105,856 ($7,057 × 15 months) with which to pay future assessed real estate taxes, and Monarch had use of (and the ability to earn interest on) that $105,856 for a full year before taxes were assessed or levied. Nonetheless, Monarch had a legitimate concern about what steps were necessary to enforce Lease obligations against a tenant in bankruptcy with a shaky cash flow and divided management, and efforts by Monarch's lawyers to obtain monthly real estate tax deposits were in those circumstances efforts "to enforce" the Lease terms as to real estate tax payments. Under these circumstances, the Respondents' argument that a credit is due for interest on the advance deposit of tax escrow is not valid.

### Fees Sought by Monarch as "Costs of Collection"

32. Monarch also seeks $21,921.50 in attorney's fees and $193.73 in costs assertedly incurred in connection with the recovery of pre-petition Lease charges owed to Monarch. Exh. 43.

33. Activities of Monarch's counsel asserted to be required for enforcement of pre-petition charges under the Lease included: (a) the preparation and filing of a proof of claim; (b) responding to Debtor requests for extensions of time to assume or reject the lease; (c) review of proposed plans of reorganization and disclosure statements, and the preparation of objections to same; and (d) court appearances in connection with efforts

to monitor the proposed plans of reorganization and related disclosure statements.

34. Monarch sought to obtain a prompt decision concerning the assumption or rejection of the Lease because lease assumption would result in payment of pre-petition charges.

35. On December 26, 1996, this Court granted the Debtor's motion for an extension of time to assume or reject the Lease. Under terms of the Court's Order (Monarch Exh. 24), the Debtor was allowed an extension through January 24, 1997. Monarch opposed this motion and was partially successful in its opposition to the extent this extension was explicitly made the "final" extension.

36. On January 24, 1997, this Court entered an Order (Monarch Exh. 25) authorizing Debtor to assume the Lease pending confirmation of a Plan of reorganization containing such a provision. Monarch objected to this Order and confirmed its objections in writing (Monarch Exh. 26). In its objection, Monarch stated that the assumption was conditional and did not provide for payment of pre-petition charges or for any reliable assurance of prompt payment of such charges.

37. Monarch's attorneys also did work with respect to reviewing the two originally proposed competing Plans of reorganization and disclosure statements, filing objections to same, and in making court appearances and other activities to monitor progress toward the adoption of a Plan of reorganization. Monarch claims these efforts were guided by the consideration that any false steps toward confirmation would delay payment to Monarch, and by concern that Monarch's interests be protected from any provision of any Plan or disclosure statement which might undermine Monarch's right to full payment of all charges due and owing under the Lease in the event the Lease were assumed.

38. However, all Monarch actually had to do to have its pre-petition claim allowed in bankruptcy was to have its counsel obtain information for and prepare a proof of claim. One part of the attorney fees charged to Monarch were for its counsel's obtaining information for and preparing Monarch's proof of claim total $234.00 (Exh. 43, p. 10, entries on 9/11/96 and 9/25/96), and these were the only fees for collection that were necessary to obtain allowance of that claim. Indeed, obtaining information for and preparing the actual proof of claim was the only collection work that Monarch could have done after the petition date; all other collection activities outside of Bankruptcy Court proceeding was barred by § 362 of the Bankruptcy Code.

39. The $21,921.50 in fees Monarch seeks for "collection of the Monarch PrePetition Claim" (excluding the proof of claim work) is for Monarch's counsel providing the following services:

  (i) contesting Debtor's request to extend time to assume or reject Lease;

  (ii) attending the creditor meeting;

  (iii) reviewing the court dockets;

  (iv) appearing in state court four times on Monarch's pending but stayed pre-petition forcible detainer action; and

  (v) appearing in this Court, reviewing and commenting on pleadings, and preparing and filing pleadings related to plans of reorganization, disclosure statements, objections to disclosure statements, attorney fee applications, Debtor's objection to the Blazer claim, Blazer discovery disputes, Imundo's claim, financing authorization requested by the Debtor, and management motions (e.g., demands for equal access-monthly reports-liquor license issues).

40. The foregoing work described in Finding 39 was not necessary for collection or covered by the Lease, in that the same constituted (i) attempts to limit the Debtor's bankruptcy rights, (ii) litigation of bankruptcy law issues, (iii) issues peculiar to federal bankruptcy law, (iv) challenges to the exercise by Debtor of rights under the Code, (v) appearances in state court on stayed litigation, and (vi) other work not analogous to a state court lawsuit to collect rent. Exh. 43. Monarch elected to have its counsel to that work; it was under no obligation to do so in order to collect what was due it under the Lease, although such work by its counsel was certainly prudent on behalf of Monarch in a bankruptcy proceeding. However, none of that work was needed or necessary for the allowance of the Monarch pre-petition claim

under § 502 of the Bankruptcy Code, Title 11 U.S.C. Therefore, only $234 is allowed as "costs of collection;" the rest is disallowed.

### Fees Sought by Monarch to Recover Claimed Post–Petition Attorney Fees and Interest

■ 41. Monarch also seeks $17,061.50 in attorney's fees and $267.50 in expenses in connection with efforts to recover post-petition interest and also to recover the preceding categories of attorney's fees and costs. The latter efforts relate to preparation and filing of a proof of claim for post-petition charges, pre-trial court appearances, and pre-trial preparation. The pre-trial court appearances and pre-trial preparation were asserted to be made necessary by the Blazer and Michaels' objection to Monarch's claim.

42. Article 29 of the Lease is the sole provision related to attorney fees. Article 29 requires that the lessee pay reasonable attorney fees incurred in collecting rent reserved under the Lease. Interest or attorney fees due are part of the rent due.

43. While the Lease contains no provision that expressly requires Debtor to pay reasonable attorney fees incurred litigating bankruptcy issues, any litigation of its claim in bankruptcy necessary to collect "rent" would certainly be covered.

44. Assumption of the Lease in bankruptcy and Debtor's consequent obligation to "cure lease defaults" and "compensate for actual pecuniary losses resulting from such default" became effective when the Plan was confirmed, pursuant to which the Lease was assumed. Monarch's claim for interest and post-petition attorney fees, to the extent allowed hereinabove, became an obligation of Debtor when the Lease was assumed upon Plan confirmation. Exh. 10 and § 365 of the Bankruptcy Code.

45. Attorney fees to adjudicate Monarch's claim to post-bankruptcy attorney fees or interest can be allowed to some extent as expenses of "enforcement of obligations under the Lease" because such fees or interest are an obligation of Debtor under the Lease which has been assumed. Exh. 1 and § 365 of the Bankruptcy Code.

46. The $17,061.50 in asserted fees for adjudicating its claim for post-bankruptcy attorneys' fees was not fully necessary, or collectable under the Lease, particularly in light of the relatively small amount of attorneys' fees for allowed "collection" efforts under the Lease and applicable law and which were necessary to enforce Lease compliance. However, use of attorneys to collect interest due under the Lease (discussed below) was entirely warranted and necessary to collect same, since respondents vigorously and erroneously resisted payment of the Lease contract rate. While precise allocation of the charges involved here is problematic, an allowance of one-half of fees and expenses sought in this part of the claim is warranted.

### Interest Sought on Monarch's Pre–Petition Claim

47. Monarch's claim seeks pre-petition interest on the pre-petition debt due it, at the contract rate of 18% per annum, amounting to $21,421.40 for the period from August 23, 1996 (the date when the Debtor filed its Chapter 11 petition herein) through August 22, 1997, with a per diem rate of $58.69 a day thereafter. Based on the per diem rate of $58.69 a day, interest on Monarch's claim for pre-petition charges for the period from August 23, 1997, through January 5, 1998, would amount to $7,981.84. Monarch thereby seeks a total of $29,403.29 in interest at the lease rate of 18% on the Monarch pre-petition claim for the period from the petition date through January 5, 1998.

48. Monarch presented no evidence, testamentary or otherwise, that it suffered any actual pecuniary loss as a result of Debtor's pre-petition defaults under the Lease. Monarch presented no evidence, testamentary or documentary, to quantify any damages suffered as a result of Debtor's pre-petition defaults under the Lease. Nonetheless, for reasons set forth in the Conclusions of Law, Monarch is fully entitled to the contract rate of interest.

### Miscellaneous

49. To the extent these Findings of Fact constitute Conclusions of Law, they shall be deemed additional Conclusions of Law. Any

fact statement set forth in the Conclusions of Law will stand as additional Findings of Fact.

## CONCLUSIONS OF LAW

### Jurisdiction

1. This Court has core jurisdiction to determine the amount of Monarch's post-bankruptcy claim under 28 U.S.C. § 157(b)(2)(A) and (B). Subject matter jurisdiction lies under 28 U.S.C. § 1334. This matter is before the Court pursuant to 28 U.S.C. § 157 and Local General Rule 2.33(A) of the United States District Court for the Northern District of Illinois. Venue lies properly under 28 U.S.C. § 1409.

■ 2. Monarch had the burden by a preponderance of the evidence to prove all aspects of its claim. *See In re Horizon Machine & Engineering Corp.*, 54 B.R. 669, 670 (Bankr.N.D.Ill.1985) ("[t]he claimant bears the burden of persuasion to prove the validity of the claim by a preponderance of the evidence"), and *Palace Entertainment, Inc. v. Bituminous Casualty Corp.*, 793 F.2d 842 (7th Cir.1986) ("Preponderance of the evidence, when used with respect to determine whether or not one's burden of proof has been met, simply means that 'greater weight of the evidence.' ")

### Lease Assumption under § 365(b)(1)

■ 3. Once the Lease was assumed upon Plan confirmation, under § 365(b)(1) of the Bankruptcy Code, Title 11 U.S.C., all contractual defaults thereunder must be cured by payments, and all contractual provisions enforced. There are no exceptions. *See, e.g., Matter of Superior Toy and Mfg. Co., Inc.*, 78 F.3d 1169 (7th Cir.1996).

■ 4. Moreover, a debtor who assumes a lease does so subject to the existing burdens thereof and may not assume the favorable aspects of the lease while rejecting the unfavorable aspects of the same lease. *In re Washington Capital Aviation & Leasing*, 156 B.R. 167, 172 (Bankr.E.D.Va.1993).

### The Interest Rate

■ 5. Interest on pre-petition Lease charges continued to run from the filing of the Debtor's petition and must be paid as a condition of the assumption of the Lease. *In re Skylark Travel, Inc.*, 120 B.R. 352, 355 (Bankr.S.D.N.Y.1990); *In re Diamond Head Emporium, Inc.*, 69 B.R. 487, 495 (Bankr.D.Hawai'i 1987); *In re Westview 74th Street Drug Corp.*, 59 B.R. 747, 757 (Bankr. S.D.N.Y.1986); *see also In re MS Freight Distribution, Inc.*, 172 B.R. 976, 978–79 (Bankr.W.D.Wash.1994).

6. In objecting to the interest component of Monarch's claim, Blazer and Michaels relied on *In re Claremont Acquisition Corporation, Inc.*, 113 F.3d 1029 (9th Cir.1997), which applied § 365, but did not involve any claim for interest. Other cases concerning interest that were cited by Blazer and Michaels involved holdings under other sections of the Bankruptcy Code and related to issues not presented here, such as enforceability of acceleration clauses and clauses providing for additional interest over and above a contractual base rate of interest. *In re Taddeo*, 685 F.2d 24 (2d Cir.1982); *In re Entz–White Lumber & Supply, Inc.*, 850 F.2d 1338 (9th Cir.1988); *In re Manville Forest Products Corp.*, 43 B.R. 293 (Bankr.S.D.N.Y.1984), *aff'd in part, rev'd in part*, 60 B.R. 403 (S.D.N.Y.1986); *In re Casa Blanca Project Lenders, L.P.*, 196 B.R. 140 (9th Cir. BAP 1996); *In re Forest Hills Associates*, 40 B.R. 410, 415 (Bankr.S.D.N.Y.1984). To the extent those cases commented on post-bankruptcy contract rate interest, the rate interest involved therein was either unquestioned or explicitly applied. *Entz–White Lumber*, 850 F.2d at 1339; *Manville Forest Products Corp.*, 43 B.R. at 299–300; *Casa Blanca Project Lenders*, 196 B.R. at 141–42; *Forest Hills Associates*, 40 B.R. at 415–16. To that extent, the latter group of cases cited by Blazer and Michaels support Monarch's position because Monarch here seeks post-petition interest at the base rate provided under the Lease.

■ 7. The 18% interest rate charged under the Lease is enforceable as a condition of the assumption of the Lease and may not be disregarded simply because an objecting

creditor regards it as inconvenient or misdescribes such rate as punitive or liquidated damages. *Matter of Superior Toy & Mfg. Co., Inc., supra; In re Washington Capital Aviation & Leasing, supra.* These cases expressed the rule that a party who is forced under § 365 to continue the performance of a lease or other executory contract is entitled to and must receive the "full benefit of the bargain."

8. Moreover, the interest rate charged under the Lease is expressly permitted under Illinois law. 815 ILCS 205/4 and 815 ILCS 205/8.

9. Now that the Lease was assumed upon Plan confirmation, Monarch has established by a preponderance of the evidence that the Debtor is required to pay post-petition interest to Monarch in the amount of $29,403.24 for the period from August 23, 1996, through January 5, 1998, with a per diem rate of $58.69 a day thereafter.[3]

■ 10. While interest was not discussed in *Superior Toy,* the "full benefit of the bargain" principle logically applies to interest:

> Although ... the Bankruptcy Code adopts the accepted proposition that there is a suspension of the accrual of interest as of the date of the filing of the petition, such rule applies to claims filed against the debtor as distinguished from defaults to be cured under assumed executory contracts. The cure of a default under an unexpired lease pursuant to 11 U.S.C. sec. 365 is more akin to a condition precedent to the

assumption of a contract obligation than it is to a claim in bankruptcy. One of the purposes of Section 365 is to permit the debtor to continue in a beneficial contract provided, however, that the other party to the contract is made whole at the time of the debtor's assumption of the contract.

*In re Diamond Head Emporium, Inc.,* 69 B.R. 487, 495 (Bankr.D.Hawai'i 1987) (holding payment of interest at lease rate on prepetition and post-petition charges required as condition of lease assumption). *See also In re Skylark Travel, Inc.,* 120 B.R. 352, 355 (Bankr.S.D.N.Y.1990) (finding payment of interest at statutory rate on post-petition debt required were lease silent as to interest rate, as condition of lease assumption).[4] Blazer and Michaels argue that these cases are distinguishable because they do not provide for the award of interest absent proof of pecuniary loss (on which evidence was not offered here). However, nothing in those precedents indicates that proof of pecuniary loss is required over and above proof of the applicable contract interest clause or a right to compensation under a state law statutory interest provision. Moreover, no further proof should be required insofar as the Debtor is required to provide the "benefit of the bargain" to the other party to an assumed lease.

■ 11. Blazer and Michaels cite *In re Orient River Investments, Inc.,* 112 B.R. 126 (Bankr.E.D.Pa.1990), in support of their argument that some further proof of pecuniary loss is required under § 365. Objectors' Findings at 16–17.[5] However, *Orient River*

---

**3.** The Lease is a written instrument. Accordingly, had the Court not found that the 18% rate provided in the Lease applies to Monarch's claim, then the 5% statutory rate "for all moneys after they become due on any ... instrument in writing" would have applied. *Montgomery Ward & Co., Inc. v. Wetzel,* 98 Ill.App.3d 243, 250, 53 Ill.Dec. 366, 423 N.E.2d 1170 (1st Dist.1981). At the 5% rate, the Debtor would have been required to pay post-petition interest in the amount of $8,167.19 for the period from August 23, 1997, through January 5, 1998, with a per diem rate of $16.30 a day thereafter. However, for reasons indicated, this computation argued by respondents is not appropriate.

**4.** The same result would apply under § 363(d)(3) of the Bankruptcy Code, which requires that a debtor timely perform all of its obligations under

an unexpired lease of non-residential real property until the lease is assumed or rejected. *In re MS Freight Distribution, Inc.,* 172 B.R. 976, 978–79 (Bankr.W.D.Wash.1994) (finding debtor required to pay interest, late fees, and attorney's fees incurred during period between order for relief and rejection of lease as administrative expense).

**5.** Blazer and Michaels also cite *In re Casa Blanca Project Lenders, L.P.,* 196 B.R. 140 (9th Cir. BAP 1996), and *In re DWE Screw Products, Inc.,* 157 B.R. 326 (Bankr.N.D.Ohio 1993), for this proposition. Objectors' Findings at 17. Monarch distinguished *Casa Blanca* in its February 2, 1998, post-trial submission at 11–12. In *DWE Products,* the court did not address the requirements for proving a claim for interest.

did not involve a claim for base rate interest charges, as is involved in this case. Also, as Blazer and Michaels acknowledge, the only proof requirements noted in *Orient River* are that a landlord's claim must be authorized by the parties' agreement and be reasonable. Monarch's interest claim is authorized by the parties' agreement, the Lease. In light of the *Superior Toy* requirement that the debtor provide the "benefit of the bargain," an analysis of the "reasonableness" of the parties' agreement is inappropriate. Nevertheless, the interest rate charged under the Lease, a commercial transaction between corporations, is permitted under Illinois law (815 ILCS 205/4 and 815 ILCS 205/8) and is lower than the rate permitted under Illinois law for consumer credit cards. 815 ILCS 205/4.1 and 815 ILCS 205/4.2.[6] It must be concluded that the 18% interest rate charged under the Lease is reasonable because the parties agreed to that lawful rate.

12. Blazer and Michaels also cite *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946), for the proposition that interest is generally suspended post-petition and that the allowance of post-petition interest is founded upon a balance of equities. Objectors' Findings at 18. However, insofar as *Vanston* predates the Bankruptcy Code, it offers no guidance with respect to § 365.[7]

■ 13. Blazer and Michaels argue that the obligation to pay interest did not arise in this case under § 365 until the time the Lease was assumed at Plan confirmation, citing *In re DWE Screw Products, Inc.*, 157 B.R. 326 (Bankr.N.D.Ohio 1993), and *In re Washington Capital Aviation & Leasing*, *supra*. Objectors' Findings at 10–11.[8] This misstates these cases, which stand for the proposition that a debtor must cure all de-faults as a condition precedent to assumption of a lease or an executory contract. Nothing in those cases suggests that a debtor at the time of assumption can simply ignore obligations under a lease or executory contract which accrued while assumption or rejection was pending. Indeed, § 365(d) requires that a debtor perform its obligations under a lease or executory contract pending assumption or rejection. *In re MS Freight Distribution, Inc.*, 172 B.R. 976, 978–79 (Bankr. W.D.Wash.1994) (stating debtor required to pay interest, late fees, and attorney's fees incurred during period between order for relief and rejection of lease as administrative expense); *In re Pacific Sea Farms, Inc.*, 134 B.R. 11, 15–16 (Bankr.D.Hawai'i 1991) (finding debtor required to pay attorney's fees for landlord's post-petition lease enforcement efforts while acceptance or rejection of the lease remained pending).

14. There has not been any showing that the Debtor is entitled to any credit against Monarch's interest claim, for any reason. Monarch is entitled to the "benefit of its bargain" with the Debtor. Accordingly, Monarch's claim for post-petition interest at a rate of 18% is sustained.

### Attorneys' Fees and Expenses

■ 15. To the extent set forth in the Findings of Facts, Monarch's charges for attorneys' fees and costs for the enforcement of the covenants, obligations, and conditions of the Lease are consistent with Article 29 of the Lease and must be paid as a condition of the assumption of the Lease. *In re Diamond Head Emporium, Inc.*, 69 B.R. 487, 496–97 (Bankr.D.Hawai'i 1987); *In re Westview 74th Street Drug Corp.*, 59 B.R. 747, 756–57 (Bankr.S.D.N.Y.1986). *See also In re MS Freight Distribution, Inc.*, 172 B.R. 976,

---

6. Compare Monarch's February 2, 1998, post-trial submission at 13 with Objectors' Findings at 15–18.

7. Also, the *Vanston* court did not question whether the contract rate of simple interest accruing post-petition (such as that sought by Monarch) should be paid, but rather addressed the issue of whether interest compounded on interest should be allowed post-petition in accordance with terms of the relevant first mortgage.

8. Blazer and Michaels also cite *Norton Bankruptcy Law and Practice*, Section 23.11.55 (1992), in connection with this argument. However, the referenced section from *Norton* is unrelated to this issue.

Blazer and Michaels make the same argument with respect to attorney's fees based on the same citations (Blazer–Michaels' Findings at 10–11), which argument is rejected for the reasons stated above.

978–79 (Bankr.W.D.Wash.1994); *In re Pacific Sea Farms, Inc.* 134 B.R. 11, 15–16 (Bankr.D. Hawaii 1991).

16. In objecting to the attorneys' fee component of Monarch's claim, Blazer and Michaels have cited several cases involving § 365 of the Bankruptcy Code: *In re Ryan's Subs, Inc.,* 165 B.R. 465 (Bankr.W.D.Mo. 1994); *In re Health Science Products, Inc.,* 191 B.R. 895 (Bankr.N.D.Ala.1995); and *In re Shangra–La, Inc.* 213 B.R. 303 (Bankr. E.D.N.C.1997). *Ryans Subs* and *Health Science Products* are distinguishable because the attorneys' fees claimed therein were outside the scope of the attorney fee clauses of the applicable agreements. *Ryan's Subs,* 165 B.R. at 468–69; *Health Science,* 191 B.R. at 910, 912. In this case, the allowed part of Monarch's claim for attorneys' fees and costs falls within the scope of the attorney fee clause of the Lease.

17. *Shangra–La* is not persuasive for the point argued because the fact that a lessor uses bankruptcy procedures to enforce a lease should not preclude recovery of attorney fees and costs for such enforcement activity, particularly where the Bankruptcy Court is the exclusive forum where the lessor can obtain any relief, being foreclosed from state court relief by the automatic stay.

18. Blazer and Michaels also argue that Monarch is not entitled to any attorneys' fees (except they concede the fee sought to prepare and file Monarch's claim) because Monarch employed bankruptcy procedures in a bankruptcy court to enforce the Lease. No such limitation appears in the Lease, and no such limitation is to be found in § 365. *In re Diamond Head Emporium, Inc.,* 69 B.R. 487, 490–92, 496–97 (Bankr.D.Hawai'i 1987) (finding debtor required to pay lessor's attorney's fees in connection with hearing on amount due for purposes of lease assumption and further required to set aside funds for payment of lessor's attorney's fees in connection with post-bankruptcy adversary proceeding); *In re Westview 74th Street Drug Corp.,* 59 B.R. 747, 756–57 (Bankr.S.D.N.Y. 1986) (stating payment of landlord's attorney's fees required where landlord opposed extension of time to assume or reject lease due to debtor-lessee's non-performance of lease obligation as condition of lease assumption). *See also In re MS Freight Distribution Inc.,* 172 B.R. 976, 978–79 (Bankr. W.D.Wash.1994) (debtor required to pay interest, late fees, and attorney's fees incurred during period between order for relief and rejection of lease as administrative expense); *In re Pacific Sea Farms, Inc.,* 134 B.R. 11, 15–16 (Bankr.D.Hawai'i 1991) (holding debtor required to pay attorney's fees for landlord's post-petition lease enforcement efforts while acceptance or rejection of lease remained pending).

19. Blazer and Michaels' attempt to distinguish *Diamond Head* on grounds that (i) the opinion did not indicate the type of services for which payment was sought; (ii) the claim for attorney's fees was reduced; and (iii) there was no holding indicating that attorney's fees were awarded based on § 365 of the Bankruptcy Code. Objectors' Findings at 13. With respect to the type of services involved, the *Diamond Head* opinion states that there was a bankruptcy court hearing to determine the amount due the landlord and a finding of pre-petition charges that were due (69 B.R. at 488, 491), a finding that the landlord was successful in establishing the amount of the default the debtor was required to cure (69 B.R. at 497), and a determination that further services were anticipated in connection with an adversary proceeding (69 B.R. at 490–92). While some, but not all, of the fees sought therein were awarded, this is not a logical reason for distinguishing the principles set forth in *Diamond Head.* Contrary to the Blazer–Michaels argument, the basis for *Diamond Head* under 11 U.S.C. § 365 is evident from the outset of the opinion with the court's statement that it was determining the amounts due and owing in connection with the assumption of a lease. 69 B.R. at 488.

20. Blazer and Michaels also attempt to distinguish *Westview 74th Street Drug Corp., MS Freight Distribution,* and *Pacific Sea Farms* on grounds that attorney's fees awarded in those cases related to post-bankruptcy defaults. Objectors' Findings at 14. However, part of Monarch's claim here seeks recovery of attorney's fees in connection with post-bankruptcy Lease enforcement. Fur-

thermore, there is no logical distinction, for purposes of § 365, between claims for attorney's fees in connection with pre-petition defaults and such claims in connection with post-petition defaults. Also, no such distinction is made under the attorney's fee clause of the Lease.

21. Blazer and Michaels cite *In re Child World, Inc.*, 161 B.R. 349 (Bankr.S.D.N.Y. 1993), in support of their argument that attorney's fees are not recoverable under § 365 where the fees have been incurred in connection with bankruptcy court hearings. Objectors' Findings at 11.[9] *Child World* involved a contested claim for attorney's fees arising out of the Debtor's filing of a Chapter 11 petition (which filing constituted a default under the subject lease) and for the costs of preparing for and attending a hearing on the Debtor's objection to the claim for such fees. 161 B.R. at 353. The claim for these fees was disallowed based on § 365(e)(1) of the Bankruptcy Code, which precludes default claims against a Debtor based simply on commencement of a bankruptcy case. 161 B.R. at 354–55. Insofar as no similar claim based on § 365(e)(1) has or could be made by Blazer and Michaels herein, this aspect of *Child World* is distinguishable.[10]

22. Blazer and Michaels also cite *Fobian v. Western Farm Credit Bank*, 951 F.2d 1149 (9th Cir.1991); *In re Coast Trading Co., Inc.*, 744 F.2d 686 (9th Cir.1984); and *In re Fulwiler*, 624 F.2d 908 (9th Cir.1980), concerning attorney fees. However, none of those cases involved § 365 of the Bankruptcy Code.

23. Since the Lease was assumed at confirmation, Monarch has established by a preponderance of the evidence that the Debtor is required to pay some attorneys' fees for reasons and to the extent stated in the Findings.

### Standards for Administrative Claims

24. Monarch seeks administrative claim status for all the foregoing charges allowed under its Lease terms for post-bankruptcy Lease enforcement. Administrative claim priority is only available when a transaction of the debtor-in-possession gave rise to liability. *Matter of Jartran, Inc.*, 732 F.2d 584, 586 (7th Cir.1984). The extent of such liability involved under the Lease has been described above.

25. However, *Jartran* also requires that the transaction involved benefit to the debtor in its operations after the bankruptcy filing. Here Debtor asserted no serious challenge to the benefit it received from continued enjoyment of its leasehold rights post-petition and after confirmation. Without that Lease, the business would have disappeared overnight. The estate and its creditors clearly benefited directly from Lease assumption and continued operations on the leased premises. Monarch's efforts described hereinabove as compensable under the Lease kept and will keep Debtor in Lease compliance and therefore protected Debtor's Lease rights as well as Monarch's cash flow.

### CONCLUSION

Therefore, judgment will separately enter that partially allows Monarch's administrative claim in conformity with the foregoing Findings and Conclusions.

---

9. Blazer and Michaels also cite *In re Bon Ton Restaurant and Pastry Shop, Inc.*, 53 B.R. 789 (Bankr.N.D.Ill.1985), in arguing that the Lease should be construed against Monarch as the draftsman. Objectors' Findings at 14. However, evidence did not establish this point. Also, *Bon Ton* supports Monarch's position that attorney's fees are allowable under § 365 in connection with bankruptcy proceedings in that the court sustained a right to fees incurred in connection with a landlord's motion in bankruptcy court related to lease enforcement. 53 B.R. at 790–91 and 798–99.

10. Furthermore, it should be noted that the debtor in *Child World* did not object to attorney's fees for other aspects of the landlord's post-bankruptcy lease enforcement (161 B.R. at 353), and the court held that the landlord could recover attorney's fees with respect to the debtor's failure to perform or comply with any other terms of the lease, "including collection efforts under the lease." 161 B.R. at 355. These aspects of *Child World* support Monarch's position here.